UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD BROOKS MILLER, *et al.*, | No. C-12-2282 EMC |
| Plaintiffs, | |
| v. | **ORDER OF DISMISSAL** |
| CARRINGTON MORTGAGE SERVICES, *et al.*, | |
| Defendants. | |
| _____/ | |

Previously, the Court issued an order instructing Plaintiff Ronald Brooks Miller to show cause why his claims based on his "bankruptcy theory" should not be dismissed with prejudice. The Court also ordered Mr. Miller to clarify the factual basis for his claims for wrongful foreclosure and quiet title other than the bankruptcy theory and to show cause as to why those claims should not also be dismissed with prejudice. *See* Docket No. 195 (order). Mr. Miller has filed a response to the order to show cause. Defendants have filed a brief in reply. Having considered the parties' briefs and accompanying submissions, the Court hereby finds that Plaintiff's wrongful foreclosure and quiet title claims are not viable. Accordingly, the Court finds that Mr. Miller has failed to show cause and his complaint is dismissed with prejudice.

Because discovery in this case has not commenced or has been very limited in nature, the Court evaluates Mr. Miller's claims under a standard akin to that provided in Federal Rule of Civil Procedure 12(b)(6). In other words, the Court evaluates whether Mr. Miller has asserted "'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067

(9th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678. The Court, however, takes judicial notice of various documents described below, the authenticity of which are not disputed.

## I. DISCUSSION

A. CapitalSource and/or Litton

Mr. Miller argues first that he has viable claims for wrongful foreclosure and quiet title because Defendants are trying to foreclose on his property even though Defendants do not have an ownership interest in his loan. According to Mr. Miller, the owner of his loan is either CapitalSource or Litton. Mr. Miller's position, however, has no support.

As to CapitalSource, Mr. Miller is correct that, in April 2008, Fremont General Corporation ("FGC") and Fremont General Credit Corporation ("FGCC"), along with Fremont Investment & Loan ("FIL") itself (Mr. Miller's lender),[1] entered into an asset purchase agreement with CapitalSource TRS Inc. *See In re FGC*, No. 08-13421-ES (C.D. Cal.) (Docket No. 31-2) (Gordon Decl., Ex. B) (Asset Purchase Agreement). However, the agreement does not reflect that Mr. Miller's loan was one of the assets purchased by CapitalSource. *See, e.g.*, *In re FGC*, No. 08-13421-ES (Docket No. 31-2) (Gordon Decl., Ex. B) (Asset Purchase Agreement § 2.1) (listing purchased assets – *e.g.*, FIL's rights with respect to the contracts and relationships giving rise to deposit liabilities). Indeed, it does not appear that any real estate loans were purchased by CapitalSource pursuant to the agreement.

As for Litton, all that Mr. Miller has offered is a document indicating that FIL sold to Litton Loan Servicing LP its *servicing* rights to loans. *See* Pl.'s RJN, Ex. F (document bearing FGC logo

---

[1] FGC and FGCC are the parent companies of FIL.

and titled "Recent Developments"). Servicing rights are distinct from the rights to the loans themselves.

B.   FIL/FRC

Mr. Miller argues next that, even if his loan was not sold to CapitalSource or Litton and instead was kept by FIL, (1) FIL was no longer a bank as of July 2008, when it surrendered its banking charter to the state of California and changed its name to Fremont Reoganizing Corporation ("FRC"),[2] and (2) in June 2010, FRC was merged into its ultimate parent FGC which was in bankruptcy proceedings.[3] Thus, according to Mr. Miller, when there was an attempt to transfer his deed of trust to Wells Fargo on May 20, 2011,[4] *see* Docket No. 16 (RJN, Ex. 5) (assignment of deed of trust), the transfer could not be valid unless the bankruptcy court approved the transfer first because FGC was still, at that time, in bankruptcy proceedings.

The problem with this contention is that, even if the transfer of the loan to Wells Fargo occurred in 2011, bankruptcy law provides that,

> as a general matter (1) "a debtor in possession shall have all the rights, . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under chapter 11," 11 U.S.C. § 1203; (2) a "trustee may operate the debtor's business," *id.* § 1108; and (3) "the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing." *Id.* § 363(c)(1).

Docket No. 195 (Order at 2). The bankruptcy of the holder of the loan thus did not preclude its transfer to Wells Fargo.

In his papers, Mr. Miller asserts that "property" as used in § 363(c)(1) does not include real property, but he cites no authority for that proposition. *See* Memo. at 4. Mr. Miller further contends that the transfer of his deed of trust could not be a transaction done in the ordinary course of

---

[2] *See, e.g.*, Pl.s' RJN, Ex. B (Am. Discl. St. at 24) (in amended disclosure statement submitted in bankruptcy case by an interested party, stating that, after the CapitalSource transaction closed in or about July 25, 2008, "FRC subsequently surrendered its banking charter to the state of California and changed its name from Fremont Investment & Loan to Fremont Reorganizing Corporation").

[3] *See* Pl.'s RJN, Ex. E (notice of bankruptcy court order).

[4] Mr. Miller asserts that this was the true date of the assignment of the deed of trust, as reflected by the notarization date.

business based on § 1203. But § 1203 simply provides that "a debtor in possession shall have all the rights, . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under chapter 11, including operating the debtor's farm or commercial fishing operation." 11 U.S.C. § 1203. Mr. Miller argues that § 1203 would not permit a debtor to, *e.g.*, "sell[] the farm," Memo. at 4, but nothing about § 1203 suggests it would automatically preclude a debtor from selling an asset of the farm or commercial fishing operation. And here, that is all that FGC (the entity that FIL merged into) was doing – selling an asset (*i.e.*, a loan secured by a deed of trust).

The Court notes that, even if FGC was not just selling Mr. Miller's loan in isolation but rather was selling his loan and other loans as part of a securitization, that would not take this transaction out of the ordinary course of business. First, Mr. Miler has not pointed to any authority stating that a securitization is necessarily *not* in the ordinary course of business. *See In re Roth Am., Inc.*, 975 F.2d 949, 952-53 (3d Cir. 1992) (noting that "courts have engaged in a two-step inquiry for determining whether a transaction is in 'the ordinary course of business'" – a horizontal inquiry which asks "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry" and a vertical inquiry which "analyzes the transactions from the vantage point of a hypothetical creditor and [asks] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit") (internal quotation marks omitted). Second, Mr. Miller has not provided any factual allegations or basis for his claim that, through the securitization, FGC was divesting itself of its "primary assets." *See In re Selgar Realty Corp.*, 85 B.R. 235, 240 (E.D.N.Y. 1988) (stating that "[t]he sale of a substantial part of a debtor's inventory is not in the ordinary course of business since it is not in the ordinary course to engage in one's own liquidation"; also stating that "the transfer of a primary asset of the debtor is not a routine, ordinary course of business matter"). It is common for banks to sell loans.

C.  Signature Group Holdings, Inc.

Mr. Miller contends that, even if his deed of trust could have been assigned without approval of the bankruptcy court, the assignment of the deed of trust is still invalid because the assignment document stated that FIL was transferring the deed of trust to Wells Fargo (as trustee for Carrington

4

1  Mortgage Loan Trust, Series 2006-FRE1), *see* Docket No. 16 (RJN, Ex. 5) (assignment of deed of
2  trust), but, in May 2011, when the assignment was made, FIL no longer existed. Thus, the
3  assignment document should have specified that the transfer was being done by Signature Group
4  Holdings, Inc. (Signature Group Holdings, Inc. became FGC's new name after it was reorganized),
5  and not FIL.

6        The Court does not find this argument sufficient to establish that foreclosure by Defendants
7  could be wrongful. Here, Mr. Miller does not dispute that Signature Group Holdings, Inc. was FIL's
8  legal successor through the bankruptcy. Thus, even if the assignment document should have
9  specified Signature Group Holdings, Inc. rather than FIL as the formal assignor (based on the
10 assumption that the transfer occurred after Signature Group Holding, Inc. succeeded FIL), there was
11 no break in the chain of title for the loan/deed of trust that would prevent Defendants from having
12 acquired an ownership interest and authority to foreclose.

13       Similarly, the Court rejects Mr. Miller's other arguments as to why the assignment document
14 is invalid. For example, Mr. Miller contends that the document was actually signed on May 20,
15 2011 (as reflected by the notarization date), and not on February 25, 2010 (the date next to Tom
16 Croft's signature). But the date that the assignment document was signed is immaterial. On both
17 dates, FGC was in bankruptcy proceedings, but, as noted above, it could still engage in the ordinary
18 course of business without prior approval of the bankruptcy court. As another example, Mr. Miller
19 points out that the document was signed by Mr. Croft, who is (according to Mr. Miller) as well-
20 known robo-signer. But Mr. Miller has failed to point to anything suggesting that Mr. Croft did not
21 in fact authorize this particular transfer. *See, e.g.*, Docket No. 167 (Croft declaration) (asserting
22 ownership interest on the part of Defendants).

23       To the extent Mr. Miller has argued in the past that Mr. Croft could not authorize the transfer
24 because MERS (on whose behalf Mr. Croft signed) lacked the authority to act on FIL or its
25 successor's behalf, that argument has routinely been rejected by the courts, both federal and state.
26 *See, e.g.*, *Lawther v. OneWest Bank*, No. C 10-0054 RS, 2010 U.S. Dist. LEXIS 131090, at *16
27 (N.D. Cal. Nov. 30, 2010) (stating that "[c]ourts in this Circuit have repeatedly recognized that
28 MERS, as a named nominal beneficiary to a Deed of Trust, has the power to make assignments and

substitutions under California's statutory foreclosure scheme"); *Siliga v. Mortgage Elec. Reg. Sys., Inc.*, No. B240531, 2013 Cal. App. LEXIS 684, at *12-13 (Cal. Ct. App. Aug. 27, 2013) (stating that "California courts have held that a trustor who agreed under the terms of the deed of trust that MERS, as the lender's nominee, has the authority to exercise all of the rights and interests of the lender, including the right to foreclose, is precluded from maintaining a cause of action based on the allegation that MERS has no authority to exercise those rights").

To the extent Mr. Miller has argued in the past that this transfer was particularly inappropriate because Mr. Croft was not only an officer of MERS but also an officer of Defendant Carrington Mortgage Services, *see* Docket No. 113 (Croft Decl. ¶ 2), the Court acknowledges it is theoretically possible that Mr. Croft could have made the transfer for the benefit of Carrington without the "true" authorization of FIL or its successor Signature Group Holdings, Inc. However, Mr. Miller has admitted in this litigation that FIL's successor Signature Group Holdings, Inc. has disclaimed any interest in the loan, *see, e.g.*, Docket No. 120) (FAC ¶ 13) (alleging that Signature Group Holdings, Inc. "has disavowed any interest," albeit claiming that this is because Signature Group Holdings, Inc. was "paid off by the FDIC, by TARP or by other government bail out programs"). Thus, there is nothing to suggest that Mr. Croft did anything improper.

D.  "Exception Report"

Mr. Miller argues that the transfer of his loan and deed of trust was improper because, even if there were some agreement involving FIL and Defendants regarding the sale of loans, Mr. Miller's loan in particular was identified as a loan that should *not* be sold. According to Mr. Miller, his loan was identified as a loan that should not be sold because (1) it was listed in an "exception report" in the Asset Purchase Agreement previously submitted by Defendants for the Court's consideration and (2) the Pooling and Servicing Agreement for the Carrington Mortgage Loan Trust, Series 2006-FRE1 (*i.e.*, the trust that Mr. Miller's loan was purportedly put into) also makes reference to an "exception report." This argument lacks merit.

Mr. Miller is correct that his loan appears on Schedule 5.7c of the Asset Purchase Agreement submitted by Defendants. *See* Docket No. 119 (Ex. 3) (Asset Purchase Agreement, Schedule 5.7c) (item number 327, identifying Loan No. 7000189440). But the Asset Purchase Agreement is

1 irrelevant because it addresses only servicing rights to loans, not ownership rights to the underlying
2 loans. *See* Docket No. 119 (Ex. 3) (Asset Purchase Agreement § 2.1) (stating that purchased assets
3 consist of servicing rights and related rights). Furthermore, as Defendants point out, even if the
4 agreement did implicate the rights to the underlying loans, § 5.7 of the agreement on its face shows
5 that the loans identified on Schedule 5.7c are not "excepted" from the agreement. Section 5.7
6 simply states that FIL is obligated to "*correct and cure* all of the outstanding exceptions with respect
7 to each Servicing File identified in the exception report attached as Schedule 5.7(c)." Docket No.
8 119 (Ex. 3) (Asset Purchase Agreement § 5.7(c)) (emphasis added).

9 As for the fact that the term "exception report" is also used in the Pooling and Servicing
10 Agreement for the Carrington Mortgage Loan Trust, Series 2006-FRE1, that is also irrelevant. The
11 Pooling and Servicing Agreement is an independent agreement, and Mr. Miller has failed to show
12 that the parties to the Asset Purchase Agreement incorporated by reference the Pooling and
13 Servicing Agreement.

14 E.  Other Foreclosure Documents

15 Finally, Mr. Miller argues that he has a valid claim for wrongful foreclosure and/or quiet title
16 because there are problems with certain foreclosure-related documents other than the assignment
17 document discussed above. The Court is not persuaded. For example:

18 •  The fact that the deed of trust that Defendants filed on June 15, 2012, *see* Docket No. 43
19    (RJN, Ex. 1), was missing pages is immaterial. Mr. Miller has provided a full and complete
20    copy of the deed of trust, *see* Docket No. 142 (RJN, Ex. 6), and nothing about the complete
21    copy alters the analysis above.

22 •  Mr. Miller claims that there were other attempts to assign the deed of trust (*e.g.*, to FGCC,
23    FIL's parent) which were defective, *see, e.g.*, Memo. at 7-8; Docket No. 142 (RJN, Exs. 4-5),
24    but, even if those assignment documents are defective, that not detract from the fact that the
25    assignment document discussed above is valid.

26 •  The notice of rescission that Mr. Zieve had recorded in September 2009, *see* Docket No. 16
27    (RJN, Ex. 4), is immaterial. Defendants are not trying to foreclose based on any document
28

7

1    filed by Mr. Zieve. Moreover, the notice of rescission actually works in Mr. Miller's favor
2    as it rescinded a notice of default.

3  • While Mr. Miller also challenges the notice of default, recorded in March 2010, *see* Docket
4    No. 16 (RJN, Ex. 7); the substitution-of-trustee document, recorded in June 2011, *see* Docket
5    No. 16 (RJN, Ex. 6); and the notice of trustee's sale, recorded in June 2011, *see* Docket No.
6    16 (RJN, Ex. 8), any purported technical defects in the documents are irrelevant because they
7    could be cured and do not detract from the fact that Defendants have an ownership interest in
8    the loan/deed of trust based on the assignment document discussed above.

F.  Defamation Claim

Finally, to the extent Mr. Miller has asserted a defamation claim, it is predicated on the purportedly false assertion by Defendants that they have an ownership interest in the loan/deed of trust.[5] Because, as discussed above, the assignment document establishes a valid ownership interest, the defamation claim fails along with the wrongful foreclosure and quiet title claims.

## II.  CONCLUSION

For the foregoing reasons, the Court finds that Mr. Miller has failed to show cause as to why his claims for relief should not be dismissed with prejudice. The critical question is whether Mr. Miller has alleged enough facts indicating that there was a break in the chain of title for his loan/deed of trust such that Defendants lack an ownership interest in the loan/deed of trust. He has failed to do so. More specifically, he has failed to establish, either through his allegations or through judicially noticeable documents, that FIL or any of its successor entities divested itself of the loan/deed of trust to any one other than Wells Fargo, acting as trustee for the Carrington Mortgage

---

[5] At a prior hearing held on August 1, 2013, *see* Docket No. 183 (civil minutes), Mr. Miller asserted for the first time that he was also claiming as a falsity the amount of debt reported to the credit-reporting agencies. Putting aside the fact that this new theory was never alleged (at least not clearly) in the operative complaint, the Court finds it problematic as well. At the hearing, Mr. Miller maintained that the amount of debt was false because he would have tendered the money due but he was unsuccessful in getting in touch with FIL and/or could not determine who owned his loan, which thus caused the amount of money he owed to "mushroom" (in Mr. Miller's words). But this is an explanation as to why Mr. Miller should have to pay less than what was reported to the credit-reporting agencies. It does not make the amount of debt "false."

Loan Trust, Series 2006-FRE1. The facts (as alleged and submitted by Mr. Miller or reflected through judicially noticeable documents) establish that:

- FIL was the owner of the loan when it issued in 2006;
- In June 2008, FGC, FIL's parent, entered into bankruptcy proceedings;
- Prior to bankruptcy, FGC sold certain assets of FIL to CapitalSource, but not any real estate loans, including Mr. Miller's;
- In July 2008, FIL surrendered its banking charter to the state of California and changed its name to FRC;
- In June 2010, FRC was merged into its ultimate parent FGC, and FGC was renamed Signature Group Holdings, Inc. (*i.e.*, the reorganized debtor);
- In an assignment dated May 2011, FIL assigned the deed of trust to Wells Fargo, acting as trustee for the Carrington Mortgage Loan Trust, Series 2006-FRE1.

Because Mr. Miller has previously made multiple amendments to his complaint, and because the Court gave Mr. Miller an opportunity with its order to show cause to defend the viability of his claims and he has failed to do so, the Court concludes that Mr. Miller's claims are futile and, accordingly, dismisses this action with prejudice.

In light of this order, all pending motions in this case, *see, e.g.*, Docket Nos. 156, 175-78, 181-82, are now moot.

The Clerk of the Court is instructed to enter judgment and close the file in this case.

IT IS SO ORDERED.

Dated: September 19, 2013

_____
EDWARD M. CHEN
United States District Judge